Martin Stecher, J.
After trial I find that in August of 1972 the plaintiff Riley, a real estate broker acting on behalf of the owners, offered for sale certain properties situated in Bronx County to the defendant Maran. On September 8, 1972 contracts of sale were signed in which the owners of the property were the sellers and the defendant Dumb, Inc., the corporate nominee of Maran, was the purchaser.
Shortly prior to September 8, 1972, on the plaintiff’s initiative, the parties agreed that the plaintiff join with Maran in acquiring title to this realty. At or before the signing of the contract of September 8, Riley, the broker, received permission from the sellers to participate in the purchase despite the conflict of interest which such participation would otherwise create. On September 12 Maran and Riley formalized their interest in the property, they then being joint venturers, with Maran having a three-quarters interest and Riley having a one-quarter interest which, at his option (which was never exercised), could be increased to a one-third interest. The total purchase price was $552,500 and Maran, through his nominee, paid on the contract the sum of $25,000. Riley reimbursed *704 Maran to the extent of $6,250. It was the intent of the joint venturers that they sell the sales contract at a profit, or find a purchaser (at a profit, of course) to whom title could be transferred in a simultaneous transaction or secure sufficient financing so that they could "mortgage out” at the closing— that is, make the purchase with all or almost all borrowed funds, thereby having little or no investment or obligation. If none of these objectives could be accomplished, the venturers were prepared to forfeit all of their $25,000 deposit or as much thereof as was necessary.
The sales contract called for all cash over the existing first mortgage of approximately $90,000. The closing date, including allowable adjournments, was December 8, 1972 with time "of the essence”. The joint venturers promptly set about seeking persons to whom the property could be resold at a profit and seeking mortgage commitments. With considerable energy, Maran, within the next two months, secured from Security Mortgage Investors, a Massachusetts investment trust, a first mortgage in the sum of $400,000; and he procured a purchaser, 1172 Anderson Corporation which agreed to pay $900,000 for the property conditioned upon the procurement of a first mortgage in the sum of $400,000 and conditioned upon the seller, Dumb, Inc., taking back a purchase-money second mortgage of $435,000 with the new purchaser paying a total of $65,000 in cash. Maran, in addition to the foregoing, procured a loan of $118,000 from certain other persons for which he agreed to pledge the prospective purchase-money second mortgage as collateral security. In short, the transaction involving these Bronx properties, was designed to produce for Maran and Riley a profit in the form of the purchase-money second mortgage of $435,000 less the principal and interest on the loan of $118,000.
The key to the transaction was the venturers’ ability to procure the financing. In negotiating the first mortgage transaction with the lender, numerous clauses were discussed including the lender’s insistence that no second mortgage be placed upon the property and that the property not be sold subject to that mortgage except with the mortgagee’s consent. Maran and Riley both opposed the insertion of such clauses in the mortgage — it would have defeated their entire plan — and the mortgage broker, Smadback, suggested that such clauses might be excluded if Security Mortgage Investors were to receive a personal guarantee. Maran communicated these *705 terms and conditions to Riley and they both agreed that the restriction on further loans and resale were unacceptable and that personal guarantees were undesirable.
Following these conversations between Maran and Riley, Maran, through "Dumb”, signed the contract to sell the property for $900,000 with the approval of Riley. A first mortgage of $400,000 now became an absolute necessity to the success of the venture.
On November 28, 1972, two weeks before the closing, Maran and his attorney together with Security Mortgage Investors’ New York attorney flew to Boston and consummated the first mortgage loan of $400,000. The mortgage excluded any restrictions or limitations on the right to impose a second mortgage or the right to sell the property subject to the mortgage but the lender insisted upon Maran’s personal guarantee. Maran executed the guarantee, returned to New York and informed Riley that the transaction was completed. He requested that Riley undertake a share of the personal obligation pro rata to Riley’s interest. Riley refused. Maran thereupon declared that if Riley would not assume the necessary obligations he was "out of the deal”. As hereafter appears, he did not adhere to this decision.
Maran thereafter closed the transactions by taking title to the Grand Concourse property in the name of the nominee Dumb; caused the nominee to convey title to Maran’s customer, 1172 Anderson Corporation; took back from 1172 Anderson Corporation a purchase-money second mortgage in the sum of $435,000 in which he, Maran, was the mortgagee; and procured the additional loan of $118,000 pledging the purchase-money second mortgage as collateral security. Maran was required by the pledgees to guarantee, personally, repayment of the $118,000 loan. He never asked Riley to guarantee any portion of this obligation and it is fair to conclude that Riley would not have done so had he been asked. Riley’s contention that he suggested that the parties take title without a guarantee by paying cash over the $400,000 first mortgage has not been proved; and, if true, was made at a time when the parties were already obligated to 1172 Anderson Corporation to provide the financing which was only available on a personal guarantee of the first mortgage.
During the period leading up to the closing and thereafter, Riley and Maran sought to compromise their differences in an arrangement whereby Maran would receive the first $5,000 of *706 profits and a participation in the venture increased from 75% to 78%. Maran’s attorney prepared an agreement purporting to represent the parties’ understanding and forwarded it to Riley within weeks of the closing. Riley and his attorneys did nothing but retain the unexecuted draft for three months after which Maran finally renounced the joint venture and sent Riley a check for his contribution, $6,250. Riley never deposited the check, but neither did he return it and he has retained it to the time of trial.
The plaintiff, Riley, seeks a declaration of the rights of the parties to the profits which are presently the purchase-money second mortgage as well as an accounting and an injunction restraining Maran and his nominee from further alienating, pledging or otherwise dealing with the plaintiff’s interest in the mortgage. The defendants counterclaim for rescission of the joint venture agreement on the ground of fraud: that the plaintiff falsely and fraudulently represented to the defendant, to induce the defendant to enter into the joint venture agreement, that the plaintiff would share all obligations with the defendant. No such representation was ever made and no fraud has been established.
The defendants’ contention that there is no joint venture because of the use of the nominee corporation (cf. Hochen v Rubin, 24 AD2d 254, 258, affd 18 NY2d 866) is without merit. The parties by using a nominee, a custom in the real estate business, may not be said to have conducted their business as a corporation (Macklem v Marine Park Houses, 17 Misc 2d 439, affd 8 AD2d 824, affd 8 NY2d 1076).
The parties were joint venturers and were, accordingly, entitled to joint management of the enterprise — one could not impose his solution to a new circumstance upon the other (Lazard Freres & Co. v John Nuveen & Co., 85 NYS2d 4, affd 275 App Div 914) — just as they were jointly entitled to share the profits and obligated to share the losses (Anderson v National Producing Co., 253 F2d 834, cert den 357 US 906). The parties, however, by their initial agreement, limited the losses which they agreed to share to the invested $25,000 and the defendant Maran was not empowered to impose on Riley a personal obligation in excess of that which he agreed to assume. Despite the fact that without Maran’s ingenuity, perserverance and willingness to take substantial risks there might have been no transaction and no profit, Maran lacked *707 the power to force upon Riley the choice of personal guarantee or withdrawal from the transaction (Lazard Freres & Co. v John Nuveen & Co., supra). While the parties, by their contract, might have made one of their number the venture manager and might have imposed an obligation to enlarge the risk or quit the venture, they failed to do so; and the court may not create such rights and obligations for them.
Accordingly, the plaintiff is entitled to a judgment and assignment declaring and evidencing that he is the owner of an undivided one-quarter interest in the purchase-money second mortgage subject to the said lien in the original sum of $118,000; and that he is entitled to have the defendant Maran account to him for the period of Maran’s stewardship of the joint venture’s affairs from the signing of the original contract to the date of the judgment to be entered. Although Riley may not be forced to undertake a personal obligation, to the extent that either of Maran’s two said undertakings requires him to pay the lender, such an obligation must, in equity, be deemed a charge upon the assets of and profits from the joint venture; and, if Maran shall be required to make payment thereon, he shall be entitled to reimbursement from the then assets of the joint venture and to the extent such assets may not be sufficient, he may recover from Riley, but not in excess of any return of capital or distribution of profit received by Riley, one quarter of Maran’s actual payment on account of his guarantees. Maran’s option to increase his share of the venture has been abandoned by him.
I note parenthetically, if sadly, that the obligation for which the joint venture’s only asset — the second mortgage — has been pledged is due and payable within one week. Just as Maran could not impose on Riley a guarantee of that obligation, Riley may not now impose on Maran the obligation to renew his personal guarantee. It is hoped that the parties will move promptly together to salvage the sole asset of their venture.
The stay imposed by me during the trial is vacated. Except for extending the joint venture’s loan (for which the mortgage has been pledged) and for a period not exceeding two years on terms not substantially different from those initially imposed, Maran may not pledge, sell or otherwise encumber or dispose of Riley’s interest in the mortgage without Riley’s consent.